Sean T. Carnathan
O'CONNOR CARNATHAN & MACK LLC
One Van de Graaf Drive, Suite 104
Burlington, MA 10803
(781) 359-9000
SCarnathan@ocmlaw.net

Sean M. Murphy (*pro hac vice*)
Andrea G. Hood (*pro hac vice*)
MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
(212) 530-5000

Robert J. Liubicic (*pro hac vice*)
MILBANK, TWEED, HADLEY & McCLOY LLP
601 South Figueroa Street
Los Angeles, CA 90017
(213) 892-4000

*Attorneys for Defendants Russell Investment Management Company
and Russell Fund Services Company*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *IN RE* RUSSELL INVESTMENT COMPANY SHAREHOLDER LITIGATION | Lead C.A. No. 1:13-cv-12631-LTS (Consolidated with No. 1:14-cv-14358-LTS) |
| | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| | ORAL ARGUMENT REQUESTED |
| | LEAVE TO FILE EXCESS PAGES GRANTED ON JUNE 13, 2016 |
| | FILED ELECTRONICALLY |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

SUMMARY OF MATERIAL FACTS ....................................................................................... 4

    A.    The Parties ............................................................................................................. 4

    B.    The Funds Would Not Exist Without Russell Investments ..................................... 5

    C.    The Independent Trustees Are Highly Qualified, And Approved RIMCo's And RFSC's Fees Pursuant to a Robust, Independent Process ............................. 6

         1.    The Independent Trustees Are Independent And Exceptionally Well-Qualified ............................................................................................... 6

         2.    The Board's Structure And Review Process Is Robust .............................. 7

         3.    The Independent Trustees Considered Extensive Information Relating To Each *Gartenberg* Factor ............................................................ 8

    D.    RIMCo and RFSC Provide All Investment Advisory And Administrative Services To The Funds ........................................................................................ 10

    E.    The Funds' Performance Is Better Than Or In Line With Similar Funds ............. 13

    F.    The Funds' Fees Are In Line With The Industry, And In Many Cases Lower Than A Large Percentage Of Peer Funds ................................................... 14

    G.    RIMCo's and RFSC's Profit Margins Are Perfectly Reasonable And Standard In The Industry ..................................................................................... 15

ARGUMENT ......................................................................................................................... 15

I.     PLAINTIFF FACES A HEAVY BURDEN TO PROVE THE FEES WERE "SO DISPROPORTIONATELY LARGE" THAT THEY BEAR "NO REASONABLE RELATIONSHIP TO THE SERVICES RENDERED" ................................................... 15

II.    PLAINTIFF HAS NOT MET HIS BURDEN OF OVERCOMING THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT UNDER *JONES'* DEMANDING STANDARD ............................................................................... 17

III.   AN ANALYSIS OF THE REMAINING *GARTENBERG* FACTORS DEMONSTRATES THAT RIMCO'S AND RFSC'S FEES MORE THAN SATISFY THE REQUIREMENTS OF SECTION 36(B) ............................................... 19

A.     Plaintiff Has Not Met His Burden On *Gartenberg*'s "Nature And Quality Of Services" Factor ................................................................................................. 19

    1.    Plaintiff Misperceives The Inquiry Under Section 36(b) ......................... 19

    2.    The Funds Have Performed Better Than Or In Line With Their Peers ....................................................................................................... 21

B.     Plaintiff Has Not Met His Burden On *Gartenberg*'s Economies Of Scale Factor ............................................................................................................... 22

C.     Plaintiff Has Not Met His Burden On *Gartenberg*'s Comparative Fees Factor ............................................................................................................... 24

D.     Plaintiff Has Not Met His Burden On *Gartenberg*'s Profitability Factor ............. 26

E.     Plaintiff Has Not Met His Burden On *Gartenberg*'s "Fall-Out Benefits" Factor ............................................................................................................... 28

IV.    PLAINTIFF LACKS STANDING WITH RESPECT TO THE RUSSELL MULTI-STRATEGY ALTERNATIVE FUND ................................................................ 29

CONCLUSION ......................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Am. Mut. Funds Fee Litig.*,
   No. 04-5593, 2009 U.S. Dist. LEXIS 120597 (C.D. Cal. Dec. 28, 2009), *aff'd
   sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th
   Cir. 2011) ...................................................................................................... *passim*

*Amron v. Morgan Stanley Inv. Advisors Inc.*,
   464 F.3d 338 (2d Cir. 2006) ................................................................................. 22

*Benak v. Alliance Capital Mgmt. L.P.*,
   No. 01-5734, 2004 U.S. Dist. LEXIS 12231 (D.N.J. Feb. 9, 2004) ....................... 20

*Billings v. GTFM, LLC*,
   867 N.E.2d 714 (Mass. 2007) ............................................................................... 29

*In re BlackRock Mut. Funds Advisory Fee Litig.*,
   No. 14-1165, 2015 U.S. Dist. LEXIS 39514 (D.N.J. Mar. 25, 2015).................... 16

*CFTC v. Hanover Trading Corp.*,
   34 F. Supp. 2d 203 (S.D.N.Y. 1999) .................................................................... 28

*Daily Income Fund, Inc. v. Fox*,
   464 U.S. 523 (1984) .............................................................................................. 29

*Forsythe v. Sun Life Fin., Inc.*,
   417 F. Supp. 2d 100 (D. Mass. 2006) ................................................................... 29

*Gallus v. Am. Express Fin. Corp.*,
   No. 04-4498, 2010 U.S. Dist. LEXIS 131264 (D. Minn. Dec. 10, 2010), *aff'd*,
   675 F.3d 1173 (8th Cir. 2012) .............................................................................. 18

*Gallus v. Ameriprise Fin., Inc.*,
   497 F. Supp. 2d 974 (D. Minn. 2007) ............................................................ *passim*

*Gallus v. Ameriprise Fin., Inc.*,
   675 F.3d 1173 (8th Cir. 2012) ......................................................................... 17, 26

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   528 F. Supp. 1038 (S.D.N.Y. 1981), *aff'd*, 694 F.2d 923 (2d Cir. 1982) ......18, 19, 20, 23

*Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*,
   694 F.2d 923 (2d Cir. 1982) ............................................................................... 1, 2

*Green v. Fund Asset Mgmt., L.P.*,
  286 F.3d 682 (3d Cir. 2002).................................................................................1

*Hoffman v. UBS-AG*,
  591 F. Supp. 2d 522 (S.D.N.Y. 2008).............................................................22, 23

*Jones v. Harris Assocs. L.P.*,
  559 U.S. 335 (2010)................................................................. *passim*

*Jones v. Harris Assocs. L.P.*,
  611 F. App'x 359 (7th Cir. 2015) ....................................................16, 17, 24, 25

*Kalish v. Franklin Advisers, Inc.*,
  742 F. Supp. 1222 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991) ..................19, 26, 27

*Kasilag v. Hartford Inv. Fin. Servs., LLC*,
  No. 11-1083, 2016 U.S. Dist. LEXIS 47063 (D.N.J. Mar. 24, 2016)........................... *passim*

*Kolancian v. Snowden*,
  532 F. Supp. 2d 260 (D. Mass. 2008) ...........................................................29

*Krinsk v. Fund Asset Mgmt., Inc.*,
  715 F. Supp. 472 (S.D.N.Y. 1988)...............................................................8, 18, 28

*Krinsk v. Fund Asset Mgmt., Inc.*,
  875 F.2d 404 (2d Cir. 1989)......................................................................17, 26

*Migdal v. Rowe Price-Fleming Int'l, Inc.*,
  248 F.3d 321 (4th Cir. 2001) ...................................................................22

*Schuyt v. Rowe Price Prime Reserve Fund, Inc.*,
  663 F. Supp. 962 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987)............................18, 27

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998)..............................................................................29

*Strougo v. BEA Assocs.*,
  188 F. Supp. 2d 373 (S.D.N.Y. 2002)............................................................17, 24

**Statutes**

15 U.S.C. § 80a-2(19) ..............................................................................6

15 U.S.C. § 80a-6(c) ...............................................................................4

15 U.S.C. § 80a-15(c) ..............................................................................2

15 U.S.C. § 80a-35(b) ..................................................................... *passim*

**Rules**

17 C.F.R. § 270.38a-1(a) ...........................................................................................12

Fed. R. Civ. P. 56...........................................................................................................1

**Other Authorities**

2 Clifford E. Kirsch, *Mutual Funds and Exchange Traded Funds Regulation* § 42
    (3d ed. 2013) ......................................................................................................12

*In re Frank Russell Company, et al.*,
    ICA Release No. 30556, 2013 SEC LEXIS 1681 (June 12, 2013)........................12

*In re Smith Barney Fund Mgmt. LLC*,
    SEC Admin. Proceeding, No. 3-11935 (May 31, 2005), *available at*
    https://www.sec.gov/litigation/admin/34-51761.pdf ..............................................28

Investment Company Institute, *The Differences Between Mutual Funds and
    Hedge Funds* (Apr. 2007), *available at* http://www.ici.org/files/faqs_hedge .........11

Investment Company Institute, Frequently Asked Questions About Mutual Fund
    Directors (Mar. 1, 2010), *available at*
    http://www.ici.org/pubs/faqs/ci.faq_fund_gov_idc.idc ............................................5

S. Rep. No. 91-184 (1969), *reprinted in* 1970 U.S.C.C.A.N. 4897 (1970) .....................20, 23, 26

U.S. Securities and Exchange Commission, *Fast Answers: Net Asset Value*,
    *available at* https://www.sec.gov/answers/nav.htm ...............................................12

U.S. Securities and Exchange Commission, IM Guidance Update No. 2014-03
    (Feb. 2014), *available at* http://www.sec.gov/divisions/investment/
    guidance/im-guidance-2014-03.pdf ..........................................................................4

Defendants Russell Investment Management Company ("RIMCo") and Russell Fund Services Company ("RFSC" and, with RIMCo, "Defendants," and with their affiliates, "Russell Investments") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 56, for summary judgment dismissing these actions with prejudice.

## PRELIMINARY STATEMENT

Plaintiff's claim in this case is that the fees charged to the ten mutual funds at issue are so excessive as to violate Section 36(b) of the Investment Company Act of 1940 (the "ICA"). Those fees were publicly disclosed. They were approved after diligent consideration by eminent, well-informed, and entirely independent trustees. And they are squarely on par with the fees paid by many other, comparable funds in the mutual fund industry—a business that is highly competitive. Plaintiff's claim has no merit and should be dismissed.

Section 36(b) provides that investment advisers have "a fiduciary duty with respect to the receipt of compensation for services" rendered to mutual funds (*i.e.*, fees funds pay to the adviser). The statute permits mutual fund shareholders to assert a claim against investment advisers for alleged breaches of that duty.[1] 15 U.S.C. § 80a-35(b). Plaintiff's burden is extremely heavy: the Supreme Court has held that to prove a breach of fiduciary duty under Section 36(b), the challenged fee must be "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining." *Jones v. Harris Assocs. L.P.*, 559 U.S. 335, 346 (2010) (adopting standard established in *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 694 F.2d 923 (2d Cir. 1982)).

---

[1] Section 36(b) authorizes only a very narrow cause of action. *Green v. Fund Asset Mgmt., L.P.*, 286 F.3d 682, 685 (3d Cir. 2002). In addition, under the ICA, the plaintiff has the burden of proof, and the court must give appropriate consideration to the approval of the challenged fees by a fund's board. 15 U.S.C. § 80a-35(b)(1)-(3).

Here, Plaintiff faces an even heavier burden because the funds' fees were scrutinized and approved by an independent board of trustees.  The ICA makes the independent trustees who sit on a fund's board primarily responsible for protecting the fund and its shareholders in dealings with the fund's adviser.  In *Jones*, the Supreme Court specifically held that if "the disinterested directors considered the relevant factors, their decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently."  *Jones*, 559 U.S. at 351.  In sum, Section 36(b) does <u>not</u> call for "judicial second-guessing of informed board decisions."  *Id.* at 352.

Plaintiff does not come remotely close to clearing the high hurdles erected by the Supreme Court for establishing a breach of fiduciary duty under Section 36(b).  The funds' independent trustees (the "<u>Independent Trustees</u>")—guided by experienced independent counsel, assisted by well-respected industry experts, and after rigorous consideration of each of the so-called "*Gartenberg* factors"[2] in a statutorily required 15(c) process[3]—concluded that Defendants' fees were reasonable in light of the services provided.  Indeed, the total fees for the

---

[2] In applying the "so disproportionately large" standard, courts typically consider six factors referred to as the "*Gartenberg* factors": (1) the nature and quality of services provided to the funds; (2) the independence and conscientiousness of the funds' trustees; (3) whether the adviser realized economies of scale in managing the funds and, if so, whether any such economies were adequately shared with the funds; (4) the fees charged to comparable mutual funds; (5) the profitability of the funds to the adviser; and (6) fall-out benefits (*i.e.*, indirect profits) to the adviser that would not occur but for the adviser's relationship with the funds.  *Gartenberg*, 694 F.2d at 928-29; *see also Jones*, 559 U.S. at 344 & n.5.

[3] The "15(c) process" is the process pursuant to which Russell Investments and others—including Lipper, Inc., Bobroff Consulting, Inc. and the Independent Trustees' counsel—provide documents and information to the funds' board ("<u>Board</u>") in connection with its review and evaluation of the funds' fees, as required under Section 15(c) of the ICA.  15 U.S.C. § 80a-15(c) ("It shall be the duty of the directors of a registered investment company to request and evaluate . . . such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such company.").

ten mutual funds named in the Complaints (the "Funds")[4] were almost all among the lowest in

the industry for their respective peer groups, and their advisory and administrative fees also were

in line with peers.

Faced with these facts, Plaintiff resorts to attacking an isolated component of RIMCo's

advisory fees by alleging that the amount of the fees RIMCo retains after paying its money

managers (*i.e.*, the third parties RIMCo has hired to perform discrete stock selection services) is

excessive in relation to the services RIMCo directly performs.[5]  Plaintiff, however, misperceives

the inquiry under Section 36(b).  Nothing in the statute requires or permits the disaggregation of

a mutual fund fee into different pieces for the purposes of attacking a portion of that fee.  Nor

does anything in the statute state that services must be provided by the adviser directly as

opposed to by a third party with whom the adviser contracts.  Indeed, in enacting Section 36(b),

Congress explicitly stated that all compensation received by a defendant and all services

rendered must be considered in assessing whether an adviser has breached its fiduciary duty

under the statute.  Plaintiff's failure to compare the full suite of services provided to the Funds—

*i.e.*, including the services provided by the money managers on RIMCo's behalf—against the

---

[4] The Funds are Russell Commodity Strategies Fund, Russell Emerging Markets Fund, Russell
Global Equity Fund, Russell Global Infrastructure Fund, Russell Global Opportunistic Credit
Fund, Russell International Developed Markets Fund, Russell Multi-Strategy Alternative Fund,
Russell Strategic Bond Fund, Russell U.S. Small Cap Equity Fund, and Russell Global Real
Estate Securities Fund.  *See* Defs.' Statement Of Material Facts Not In Dispute In Supp. Of Their
Mot. For Summ. J. (June 24, 2016) (filed contemporaneously herewith) ("SMF") ¶ 1.  Each of
the Funds are investment portfolios of Russell Investment Company ("RIC"), a registered
investment company under the ICA.  *Id.* ¶ 2.

[5] *See, e.g.*, Compl. ¶ 2, *McClure v. Russell Investment Management Company, et al.*, No. 13-
12631 (D. Mass. Oct. 17, 2013), ECF No. 1 ("*McClure I* Compl.") (alleging RIMCo "delegat[ed]
a substantial portion of its investment management duties to the Money Managers and
perform[ed] minimal additional work that was predominantly supervisory in nature"); Compl.
¶ 2, *McClure v. Russell Investment Management Company, et al.*, No. 14-14358 (D. Mass. Dec.
8, 2014), ECF No. 1 ("*McClure II* Compl.") (same).

Funds' total advisory fee is a fundamental defect that, on its own, warrants summary judgment for Defendants.

In any event, Plaintiff's declaration that RIMCo provides "minimal" services to the Funds is unsupported:  RIMCo created and organized the Funds, and is ultimately responsible for managing and coordinating their wide-ranging operations, including by (among many other things) providing an array of investment management, legal, compliance, and board governance services.  RIMCo also retains ultimate contractual responsibility for managing the Funds, and assumes substantial entrepreneurial, legal and regulatory risks related to those roles.

At bottom, this case and similar ones brought by Plaintiff's counsel against numerous other advisers represent a broad attack on the adviser-subadviser structure for mutual funds (*i.e.*, the "manager of managers" structure).  But over nearly two decades, the U.S. Securities and Exchange Commission ("SEC") has approved as "in the public interest and consistent with the protection of investors," more than two hundred exemptive applications authorizing such arrangements.[6]  There is nothing unusual about RIMCo's business model or its fees.[7] Defendants' motion should be granted.

## SUMMARY OF MATERIAL FACTS

### A.      The Parties

Plaintiff alleges that he is an investor in the Funds.  *McClure I* Compl. ¶ 7.  A mutual fund is "a pool of assets, consisting primarily of [a] portfolio [of] securities, and belonging to the

---

[6] *See* 15 U.S.C. § 80a-6(c); SEC, IM Guidance Update No. 2014-03 (Feb. 2014), *available at* http://www.sec.gov/divisions/investment/ guidance/im-guidance-2014-03.pdf.

[7] Likewise, Plaintiff's challenge to the administrative fees the Funds pay to RFSC fails to raise any genuine issue for trial.  As discussed below, the Funds' administrative fees are wholly consistent with the administrative fees charged to other funds, and the Board approved the fees after careful consideration of (among other things) the extensive services RFSC provides in exchange for the fees.

individual investors holding shares in the fund." *Jones*, 559 U.S. at 338 (alteration in original) (citation omitted).  A fund is typically externally managed; it is not an operating company and it has no employees in the traditional sense.[8]  Rather, it relies on service providers that are either affiliate organizations or independent contractors (*e.g.*, an investment adviser, administrator, and others) to carry out its business activities.[9]  The ICA, which regulates mutual funds, requires a mutual fund to have a board of trustees, which serves as the "watchdog" of the relationship between the fund and its service providers.  *Jones*, 559 U.S. at 348.  The ICA entrusts the board with "a host of special responsibilities," including that "they must review and approve the contracts of the investment adviser annually, and a majority of these directors must approve an adviser's compensation."  *Id.* at 340 (internal citations and quotations omitted).

Defendant RIMCo is a registered investment adviser, and serves as the Funds' investment adviser.  SMF ¶ 3.  Until recently, RIMCo was a wholly-owned subsidiary of Frank Russell Company ("<u>FRC</u>").  *Id.* ¶ 4.  Defendant RFSC is a wholly-owned subsidiary of RIMCo that serves as the Funds' administrator.  *Id.* ¶¶ 16-17.

### B.    The Funds Would Not Exist Without Russell Investments

As the sponsor of the Funds, Russell Investments creates the Funds and is responsible for running them—a complex task that involves setting up the entire organization of the Funds, contracting with service providers, establishing the Funds' investment parameters, and overseeing and coordinating the Funds' many disparate parts—from portfolio management, to fund accounting, to compliance, to legal matters, and to distribution, among many other things. SMF ¶¶ 46-64, 16 n.9.  In other words, the Funds would not exist without Russell Investments.

---

[8] *See* Investment Company Institute, Frequently Asked Questions About Mutual Fund Directors, (Mar. 1, 2010), *available at* http://www.ici.org/pubs/faqs/ci.faq_fund_gov_idc.idc.

[9] *Id.*

As part of the business of running the Funds, Russell Investments (through RIMCo and RFSC) provide the Funds with highly specialized investment advisory and administrative services under, respectively, an Advisory Agreement between RIMCo and RIC and an Administrative Agreement between RFSC and RIC (together, the "Agreements").  SMF ¶¶ 3, 16; *infra* Summary of Material Facts § D.  Under the Agreements, RIMCo and RFSC are paid, respectively, advisory fees and administrative fees from the Funds, expressed as a percentage of assets.  SMF ¶¶ 5, 18, 20-21.  Although the Advisory Agreement permits RIMCo to hire money managers to perform certain portfolio management services, Russell Investments retains overall responsibility for the Funds' management and bears significant risks as a result.  *Id*. ¶¶ 8, 12, 42.

### C.      The Independent Trustees Are Highly Qualified, And Approved RIMCo's And RFSC's Fees Pursuant to a Robust, Independent Process

A highly qualified Board, comprised of a supermajority of Independent Trustees, approved all of the fees challenged by Plaintiff following rigorous, independent scrutiny, including the assistance of independent experts and independent counsel.  SMF ¶¶ 22-45.

### 1.      The Independent Trustees Are Independent And Exceptionally Well-Qualified

Although the ICA requires that only 50% of a fund's trustees be independent or "disinterested," a supermajority of the Funds' trustees were independent of Russell Investments, and for most of the relevant time period, only one of the Board's eight trustees was "interested." SMF ¶¶ 22-23; 15 U.S.C. § 80a-2(19) (defining "interested person" for purposes of the ICA).

The Independent Trustees—including the Board's independent chair, Kristianne Blake, CPA—are all preeminent individuals in their respective fields.  SMF ¶ 22.  Collectively, the Independent Trustees have substantial investing, finance, accounting, administrative, and other

relevant experience.  *Id*.  None of the Independent Trustees is affiliated with Russell Investments.  *Id*. ¶¶ 13 n.4, 22.

The Independent Trustees have their own independent and highly qualified mutual fund counsel from the firm Stradley, Ronon, Stevens & Young, LLP ("Stradley").  SMF ¶ 24. Stradley advised the Independent Trustees concerning their fiduciary duties and assisted them with their deliberation and approval of the Funds' Agreements.  *Id*. ¶¶ 24, 33.  Notably, the Independent Trustees also relied on a host of independent industry experts, including Lipper, Inc. ("Lipper") and Bobroff Consulting, Inc. ("Bobroff Consulting").  *Id*. ¶¶ 25-26.

**2.      The Board's Structure And Review Process Is Robust**

The Independent Trustees conduct a robust, continuous process to review the Funds' fees, involving numerous Board meetings and extensive preparation.  SMF ¶¶ 32-43.  The Board has a number of regularly scheduled meetings each year, each lasting at least one day, in addition to special meetings convened as circumstances require.  *Id*. ¶¶ 27-29.  Between 2012 and 2014, the Board held twenty-three separate meetings.  *Id*. ¶ 30.  Additionally, the Board has an Investment Committee and an Audit Committee, each of which met numerous times.  *Id*. ¶ 31.

At least once a year, the Board holds a meeting at which it votes on whether to approve the Agreements and the fees paid to Defendants thereunder.  SMF ¶ 28.  This approval is based on the culmination of almost one year of work, involving extensive review of materials received and work done at prior meetings, among other things.  *Id*. ¶¶ 32-43.  The material considered by the Independent Trustees, described in more detail below, is detailed and thorough—during each annual contract review process, the Board considered hundreds of pages of materials relating to the Funds, the *Gartenberg* factors, and the Funds' fees.  *Id*.

### 3. The Independent Trustees Considered Extensive Information Relating To Each *Gartenberg* Factor

The Independent Trustees consider extensive information throughout the year related to the approval of the Agreements, including detailed information on each *Gartenberg* factor. SMF ¶¶ 32, 34-43.  Among many other things, the Board receives detailed information about the nature and quality of RIMCo's, the money managers' and RFSC's services and personnel (*Id*. ¶¶ 14, 35); the Funds' performance (*Id*. ¶¶ 36, 38); potential economies of scale (*Id*. ¶ 37);[10] potential fall-out benefits (*Id*. ¶ 41);[11] and RIMCo's costs and profitability from managing and administering the Funds (*Id*. ¶ 40).  That information included extensive data concerning the Funds from independent third parties, such as Lipper and Bobroff Consulting, including information comparing the Funds' advisory fees, administrative fees, overall expense ratios, and performance to those of similar mutual funds.  *Id*. ¶¶ 25-26, 38.

The Independent Trustees also review a memorandum from their independent counsel regarding their responsibilities with respect to approval of the Agreements.  SMF ¶ 24.  Prior to approving the Funds' fees, the Independent Trustees also meet with their counsel in executive sessions, outside the presence of Russell Investments, to discuss the Funds' fees and other matters and, if necessary, require Russell Investments to provide additional information relevant to their consideration.  *Id*. ¶¶ 33, 43.

---

[10] Economies of scale occur when the long-run average cost of producing a good or service decreases, on a per unit basis, as the level of output increases.  *See In re Am. Mut. Funds Fee Litig.*, No. 04-5593, 2009 U.S. Dist. LEXIS 120597, at *77 (C.D. Cal. Dec. 28, 2009), *aff'd sub nom. Jelinek v. Capital Research & Mgmt. Co.*, 448 F. App'x 716 (9th Cir. 2011).

[11] Fall-out benefits are indirect benefits that an investment manager or its affiliates would not have received "but for the existence of the Fund[s]."  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *142 (quoting *Krinsk v. Fund Asset Mgmt., Inc.*, 715 F. Supp. 472, 495 (S.D.N.Y. 1988)).

The Independent Trustees considered each *Gartenberg* factor before they approved each Fund's fees.  SMF ¶ 34.  During Board meetings, the Independent Trustees—guided by their independent counsel—evaluated, among other things:

- **Nature and Quality of Services**.  The Independent Trustees evaluated the range of services provided by RIMCo and RFSC, including the specialized investment expertise that RIMCo provides by selecting and allocating assets to carefully vetted money managers, and the quality of RIMCo's and RFSC's professional personnel who provide those and many other services to the Funds.  *Id.* ¶¶ 35, 46-48, 51.

- **Economies of Scale**.  The Independent Trustees considered information regarding RIMCo's and RFSC's potential realization of economies of scale and whether savings from any such economies were shared with the Funds, including waivers for the Funds' advisory fees and breakpoints in the Funds' administrative fees based on, among other things, analyses from Bobroff Consulting.  *Id.* ¶¶ 25, 37.

- **Comparative Fees**.  The Independent Trustees considered extensive information independently compiled by third-party expert Lipper comparing the advisory and administrative fees for each of the Funds to similar funds.  *Id.* ¶ 38.

- **Profitability**.  The Independent Trustees considered RIMCo's and RFSC's profitability, both overall and for each Fund (as well as the methodology used to calculate that profitability), and RIMCo's profitability relative to industry peers.  *Id.* ¶ 40.

- **Fall-out Benefits**.  The Independent Trustees evaluated the extent to which Russell Investments derived any fall-out benefits as a result of its relationship with the Funds.  *Id.* ¶ 41.

After considering each *Gartenberg* factor and the materials provided to them in advance of each meeting, the Independent Trustees concluded that the compensation under the Agreements was fair and reasonable, and were specifically aware of the differences in services provided by RIMCo and its money managers and the amount of fees retained by RIMCo.  *Id.* ¶¶ 6, 13-14, 19.

The Independent Trustees' independence and conscientiousness are underscored by numerous examples of active arm's-length bargaining with Russell Investments.  Most notably, the Independent Trustees obtained fee concessions from Russell Investments on a number of occasions, including through fee waivers, the implementation of breakpoints for the Funds'

administrative fees, and subsequent revisions to the breakpoints to reduce the fees.  SMF ¶¶ 25,

44-45.  Moreover, the Independent Trustees routinely demonstrated their independence by

requiring Russell Investments to provide additional information to assist their review—including

additional information regarding fee waivers, breakpoints, economies of scale, and RIMCo's

direct investing services.  *Id*. ¶ 43.

**D.     RIMCo and RFSC Provide All Investment Advisory And Administrative
        Services To The Funds**

Under the Agreements, RIMCo and RFSC are responsible for providing, respectively, all

the Funds' advisory and administrative services, which include a host of portfolio management,

compliance, legal and many other services—all of which the Independent Trustees considered

prior to approving the Funds' fees.  SMF ¶¶ 35, 46-64.  The complex, specialized services

RIMCo provides as the Funds' investment adviser include, but are not limited to:

- Establishing and designing the Funds, which involves, among other things, developing the strategy of the Funds at inception and amending the strategy of the Funds to account for ever-changing market conditions through RIMCo's Asset Class teams and Capital Markets teams (*Id*. ¶ 48);

- Directly managing portions of the Funds' assets to achieve strategic positioning, increase potential returns, and better manage risks (*Id*. ¶¶ 49-50);

- Providing stock-picking and stock research services for certain portions of the Funds' assets through the engagement of money managers (*Id*. ¶¶ 8-12, 15, 48);

- Conducting extensive research on money managers, including through a vast database of manager research maintained by RIMCo's former parent company, FRC (*Id*. ¶¶ 47-48, 52);

- Performing extensive due diligence on the Funds' dozens of money managers, including through regular meetings with the managers, on-site and remote due diligence meetings, and quarterly and annual reports relating to the managers' compliance with investment guidelines and regulations (*Id*. ¶¶ 15, 51);

- Monitoring the money managers' compliance with the Funds' investment strategies and policies and changes that may impact the Funds or the money managers' operations (*Id*. ¶ 51);

- Hiring, terminating, and replacing money managers for the Funds, through a robust process that involves proposing the changes to a Portfolio Management Sounding Board and an Investment Strategy Committee (*Id*. ¶¶ 52-55);

- Allocating and re-allocating Fund assets among the multiple money managers for each Fund, including as many as twelve managers for a single Fund (*Id.* ¶¶ 15, 56);

- Monitoring overall performance of the Funds and examining ways to improve Fund performance (*Id.* ¶ 47);

- Coordinating the Funds' extensive 15(c) process, including preparing numerous reports and other materials that are provided to the Funds' Board in connection with the Board's annual review and approval of the Agreements (*Id.* ¶ 57); and

- Performing certain legal and compliance functions, including gathering information for the Funds' legally required disclosures to investors and to regulatory authorities (*Id.* ¶ 58).

To assist RIMCo in providing some of its advisory services to the Funds (and after extensive due diligence), RIMCo has entered into portfolio management contracts with the Funds' money managers (the "Portfolio Management Contracts").  SMF ¶¶ 8-13.  As part of their services on behalf of RIMCo, the money managers select and trade securities (in accordance with investment guidelines and other instructions from RIMCo) for the portions of Fund assets that RIMCo has allocated to the managers.  *Id.* ¶ 9.  The Portfolio Management Contracts make clear that the money managers perform their services subject always to RIMCo's instructions and control.[12]  *Id.* ¶ 11.  Further, the services performed by the money managers on behalf of RIMCo are, contrary to Plaintiff's bald assertions, hardly the "majority" of the advisory services needed to run the Funds.  Mutual funds are "among the most strictly regulated financial products" in the world[13] and require substantial infrastructure to service.  As indicated above, Russell Investments provides almost all of this infrastructure directly to the Funds.

---

[12] *See, e.g.*, Decl. of Andrea G. Hood In Supp. of Defs.' Mot. For Summ. J. (June 24, 2016) (filed contemporaneously herewith) ("Hood Decl."), Ex. 15, Portfolio Management Contract, at RIMCO_0057142 ("Money Manager shall be subject to and shall comply with . . . [s]uch specific instructions as the Board or RIMCo may adopt  . . . and [a]ny other instructions from RIMCo. . . .  RIMCo may, at any time, instruct Money Manager in the performance of Money Manager's functions.").

[13] *See* Investment Company Institute, *The Differences Between Mutual Funds and Hedge Funds* (Apr. 2007), *available at* http://www.ici.org/files/faqs_hedge.

RIMCo's use of money managers is anything but unique:  employing money managers (*i.e.*, subadvisers) is a common practice in the investment management industry.  *See* 2 Clifford E. Kirsch, *Mutual Funds and Exchange Traded Funds Regulation* § 42 (3d ed. 2013).  The use of subadvisers provides important benefits to fund investors, such as allowing a manager to utilize the skills and experience of specialized portfolio managers.  *Id.* § 42:1.2.  Indeed, the SEC specifically approved RIMCo's use of money managers.[14]  In any event, the Independent Trustees review and approve RIMCo's engagement of money managers, and are fully familiar with the managers' services and the structure and amount of the managers' fees.  SMF ¶¶ 13-14.

Likewise, prior to approving the Funds' administrative fees, the Independent Trustees consider the extensive administrative services RFSC provides to the Funds.  SMF ¶¶ 35, 59-64.  Those services include, among many other things: preparing the Funds' numerous regulatory filings and shareholder reports; preparing the Funds' financial statements; implementing the Funds' mandatory compliance program under Rule 38a-1 and monitoring the Funds' compliance with the ICA and the massive body of regulations thereunder;[15] overseeing and implementing procedures for pricing the Funds' thousands of securities; confirming the accuracy of the Funds' daily net asset value ("NAV");[16] overseeing the Funds' service providers; preparing the Funds' tax returns and other tax-related reports; and providing the office space, facilities and equipment necessary for the business operations of the Funds.  *Id.* ¶¶ 59-64.

---

[14] *See In re Frank Russell Company, et al.*, ICA Release No. 30556, 2013 SEC LEXIS 1681 (June 12, 2013) (granting exemptive relief for RIMCo).

[15] Funds are required to adopt and implement written policies and procedures that are reasonably designed to prevent violations of the federal securities laws and review such policies and procedures at least annually for their adequacy and effectiveness.  17 C.F.R. § 270.38a-1(a).

[16] A fund's NAV (which is equal to the value of all of the securities and cash held by the fund, divided by the total number of shares) is the price at which investors buy and sell shares in the Funds.  SEC, *Fast Answers: Net Asset Value*, *available at* https://www.sec.gov/answers/nav.htm.

The Independent Trustees also considered the significant entrepreneurial, legal, regulatory and operational risks Russell Investments bears with respect to the Funds.  SMF ¶ 42. These risks are heightened because RIMCo—not the money managers—has ultimate responsibility for the Funds' management under the Advisory Agreement.[17]  *Id*. ¶¶ 12, 46-47.

## E.  The Funds' Performance Is Better Than Or In Line With Similar Funds

The Independent Trustees also considered the Funds' undisputed performance figures as part of their Section 15(c) process.  SMF ¶¶ 36, 38, 72.  That data shows that the Funds have performed better than or in line with similar funds.  Three of the five Funds with ten years of performance data (Russell International Developed Markets, Russell Emerging Markets, and Russell Global Real Estate Securities Funds) each outperformed at least 50% of their Lipper peers for the 10-year period ending December, 31 2013.  *Id*. ¶ 72.  The other two Funds (Russell Strategic Bond and Russell U.S. Small Cap Equity Funds) outperformed, respectively, over 33% and 22% of their peers in that same time period.  *Id.*  With respect to the remaining five Funds, one outperformed over 60% of its peers in the five-year period ending December 31, 2013 (Russell Global Equity Fund), three outperformed, respectively, over 80%, 40% and 29% of their peers in the three-year period ending December 31, 2013 (Russell Global Opportunistic Credit, Russell Global Infrastructure, and Russell Commodities Strategies Funds), and one did not have performance data for those time periods.  *Id.*

---

[17] Hood Decl. Ex. 9, Advisory Agreement, at RIMCO_0030583 (RIMCo retains "overall supervisory responsibility for the general management and investment of the [Funds'] assets and securities portfolios"); *id.* Ex. 10, Advisory Agreement, at RIMCO_0310816 (appointment of money managers shall not "relieve [RIMCo] of its duties and obligations with respect to the management of each Fund's assets").

**F.      The Funds' Fees Are In Line With The Industry, And In Many Cases Lower Than A Large Percentage Of Peer Funds**

The Funds' fees are in line with comparable funds.  Each year, Lipper provides the Board with detailed analyses of each Fund's fees, including comparisons to similar funds.  SMF ¶ 38. In 2013, that data showed that, with the exception of one Fund, each of the Funds' total fees was in the very lowest or second to lowest quintile among their respective peer funds—*i.e.*, at least 60% to 80% of the Fund's respective peers had <u>higher</u> total fees than the Funds.[18]  *Id.* ¶ 69.

The Funds' advisory fees, even before fee waivers,[19] ranged from 0.50% to 1.50% of fund assets—levels consistent with the Funds' peer funds.  SMF ¶ 70.  In 2013, Lipper data showed that two of the Funds' advisory fees ranked in the second quintile among peers (*i.e.*, at least 60% of peer funds had higher fees), and four of the Funds' fees ranked in the fourth quintile (*i.e.*, at least 20% of peer funds had higher fees).  *Id.* The advisory fees for the remaining four Funds were in the fifth quintile, but their fees were only slightly higher than the median fee.  *Id.*

The Funds' effective administrative fees were 0.048%, which also is in line with peer funds.  SMF ¶ 71.  Four of the Funds' administrative fees were at or below median compared to their Lipper peers, and the other six Funds were in the third or fourth quintile (*i.e.*, their fees were lower than at least 20% to 40% of peer funds).  *Id.* ¶ 71.  In addition, the Funds' administrative fee schedules contain breakpoints, which reduce the fees as the RIC funds' aggregate assets increase past specified thresholds.  *Id.* ¶ 21.

---

[18] The one exception is the Russell Commodity Strategies Fund, whose total fees in 2013 were just barely above median—1.269% compared to 1.264%.  SMF ¶ 69.

[19] As a result of negotiations with the Board, RIMCo has contractually agreed to waive fees for four of the Funds, including the Russell Global Opportunistic Credit Fund (waiving 0.28% of 1.00% advisory fee), the Russell Commodity Strategies Fund (0.27% of 1.25%), the Russell Global Infrastructure Fund (0.31% of 1.25%), and the Russell Strategic Bond Fund (.01% of 0.50%).  SMF ¶ 44.  From 2012 to 2015, RIMCo's fee waivers resulted in over <u>$41 million</u> in savings for Fund investors.  Hood Decl. Ex. 89, C. James Report ¶ 129 & Ex. 12.

### G.      RIMCo's and RFSC's Profit Margins Are Perfectly Reasonable And Standard In The Industry

RIMCo and RFSC have not earned any outsized profits with respect to the Funds. Including distribution costs, RIMCo's pre-tax, overall profit margin for all of the RIC funds collectively ranged from REDACTED            from 2012 to 2013—hardly staggering numbers. SMF ¶ 79.  On a fund-by-fund basis, RIMCo's and RFSC's pre-tax profit margins, including distribution expenses, has ranged from, respectively, REDACTED           with respect to the advisory fees and REDACTED with respect to the administrative fees.  *Id*. ¶¶ 74, 77.  When considered on a pre-distribution basis, RIMCo's overall profitability for the RIC funds was <sup>REDACTED</sup> REDACTED and its profitability for the Funds was REDACTED (advisory) and REDACTED (administrative).  *Id*. ¶¶ 73, 76, 79.  As discussed below, these margins are squarely within the range of margins upheld in prior Section 36(b) cases.  *Infra* § III.D.

### ARGUMENT

### I.      PLAINTIFF FACES A HEAVY BURDEN TO PROVE THE FEES WERE "SO DISPROPORTIONATELY LARGE" THAT THEY BEAR "NO REASONABLE RELATIONSHIP TO THE SERVICES RENDERED"

Plaintiff cannot meet his burden of establishing a Section 36(b) violation:  there is nothing unusual about the Funds' fees, Defendants' services, or the Funds' performance.

The ICA specifically places the burden of proof on the plaintiff in a Section 36(b) case. 15 U.S.C. § 80a-35(b)(1); *Jones*, 559 U.S. at 350 n.8 ("[P]laintiffs bear the burden in showing that fees are beyond the range of arm's-length bargaining.").  The Supreme Court has explicitly held that a fee violates Section 36(b) only if it is "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's length bargaining."  *Jones*, 559 U.S. at 346 (affirming the *Gartenberg* standard).

In fact, Plaintiff faces an even higher burden here because the challenged fees were approved by an independent board advised by its independent counsel pursuant to a robust process that included the review of extensive information pertinent to each *Gartenberg* factor. As the Supreme Court explained in *Jones,* "[w]here a board's process for negotiating and reviewing investment-adviser compensation is robust, a reviewing court should afford commensurate deference to the outcome of the bargaining process." *Jones*, 559 U.S. at 351.

As a number of courts have observed, the *Gartenberg* standard endorsed by the Supreme Court in *Jones* "establishes a very high hurdle to overcome." *In re Am. Mut. Funds Fee Litig*., 2009 U.S. Dist. LEXIS 120597, at *14; *In re BlackRock Mut. Funds Advisory Fee Litig.*, No. 14-1165, 2015 U.S. Dist. LEXIS 39514, at *27 (D.N.J. Mar. 25, 2015) (plaintiffs face an "onerous standard for liability under Section 36(b)").  Indeed, on remand in *Jones*, and applying the standard articulated by the Supreme Court, the Seventh Circuit Court of Appeals recently affirmed the district court's original grant of summary judgment for the defendant adviser. *Jones v. Harris Assocs. L.P.*, 611 F. App'x 359 (7th Cir. 2015).  The Seventh Circuit approached the plaintiffs' claim with a two-step analysis. <u>First</u>, the court looked to whether the "record shows that Harris's fee was comparable to that produced by bargaining at other mutual-fund complexes, which tells us the bargaining range." *Jones,* 611 F. App'x at 361.  In this regard, the court rejected plaintiffs' attempt to compare the fees paid by the mutual funds at issue to the fees paid by the adviser's non-mutual fund, institutional clients (*e.g.*, pension funds), and held that "the Act does not necessarily ensure fee parity between mutual funds and institutional clients." *Id*. <u>Second</u>, the court looked to whether the "evidence implied that [the adviser's] services were worth less than the services that other advisers provide for other funds, [which] would imply that arm's length bargaining would produce a lower fee." *Id*.

The Seventh Circuit found that (1) the challenged fees fell within the bargaining range as evidenced by fees charged at other mutual fund complexes, and (2) the adviser's services were not worth less than the services provided by those other fund complexes because the adviser to the funds at issue performed "as well as, if not better than, comparable funds."  *Id*. at 360-62. Accordingly, the court affirmed summary judgment for the adviser.  *Id.* at 362.

As in *Jones*, the Funds' fees are squarely within the range of fees for peer funds and the Funds performed consistently with or better than their peers.  For these and the other reasons discussed herein, Plaintiff has not met Section 36(b)'s exacting standard.  *See also Gallus v. Ameriprise Fin., Inc.*, 675 F.3d 1173 (8th Cir. 2012) (affirming summary judgment for adviser); *Strougo v. BEA Assocs.*, 188 F. Supp. 2d 373 (S.D.N.Y. 2002) (same).

## II.   PLAINTIFF HAS NOT MET HIS BURDEN OF OVERCOMING THE INDEPENDENT TRUSTEES' BUSINESS JUDGMENT UNDER *JONES'* DEMANDING STANDARD

Under *Jones*, the Independent Trustees' "decision to approve a particular fee agreement is entitled to considerable weight, even if a court might weigh the factors differently."  *Jones*, 559 U.S. at 351; *Krinsk v. Fund Asset Mgmt., Inc.*, 875 F.2d 404, 412 (2d Cir. 1989) ("The expertise of the [independent directors], whether they are fully informed, and the extent of care and conscientiousness with which they perform their duties are among the most important factors to be examined . . . .").  There are no genuine issues of material fact that warrant usurping the role of the Independent Trustees by overturning their approval of the Funds' fees.  *Kasilag v. Hartford Inv. Fin. Servs., LLC*, No. 11-1083, 2016 U.S. Dist. LEXIS 47063, at *29-45 (D.N.J. Mar. 24, 2016) (granting summary judgment with respect to board process).

The Independent Trustees were exceptionally well-qualified, and their contract approval process was thorough.  The Board met frequently, considered each *Gartenberg* factor, reviewed detailed materials regarding those factors, and retained highly qualified independent experts to

assist with their deliberations, including Lipper and Bobroff Consulting. *Supra* Summary of Material Facts § C. The Independent Trustees also demonstrated their independence by actively negotiating at arm's-length. Among other things, the Independent Trustees secured fee waivers for four of the Funds, effected the addition of breakpoints in the Funds' administrative fees (thereby reducing the fees as assets increased), and subsequently negotiated for breakpoints at lower asset levels. *Supra* Summary of Material Facts § C.3. The Independent Trustees also actively questioned and demanded additional information from Russell Investments. *Id.*; *Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 984 (S.D.N.Y. 1987), *aff'd*, 835 F.2d 45 (2d Cir. 1987) (independent trustees "carefully analyzed and debated the information they were given [and] also actively questioned the Adviser and requested additional information when they needed it").

The summary judgment decision in *Gallus*, and the court's ruling on the board process in *Kasilag*, are directly on point.[20] In both of those cases, the courts—on board-related facts nearly identical to those here—deferred to the business judgment of the independent trustees. For example, just like the Independent Trustees in this case, in *Kasilag* and *Gallus* the independent trustees:

- Reviewed and considered information on each *Gartenberg* factor prior to approving the challenged fees. *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *16-17; *Gallus*, 497 F. Supp. 2d at 976, 980-83; *see also Krinsk*, 715 F. Supp. at 502; *Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F. Supp. 1038, 1059-60 (S.D.N.Y. 1981); *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *146.

---

[20] *Kasilag*, 2016 U.S. Dist. LEXIS 47063; *Gallus v. Ameriprise Fin., Inc.*, 497 F. Supp. 2d 974 (D. Minn. 2007); *see also Gallus v. Am. Express Fin. Corp.*, No. 04-4498, 2010 U.S. Dist. LEXIS 131264, at *5-6 (D. Minn. Dec. 10, 2010) (reinstating summary judgment), *aff'd*, 675 F.3d 1173 (8th Cir. 2012) (affirmed based on deference to board required under *Jones*) (quoting *Jones*, 559 U.S. at 351).

- Relied on independent counsel and other independent industry experts in reviewing the Funds' fees, including Lipper and (in *Kasilag*) Bobroff Consulting. *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *15-16 (the board "relied upon the advice of outside consultants and counselors," including "independent legal counsel" and "Lipper Inc. and Bobroff Consulting"); *Gallus*, 497 F. Supp. 2d at 976, 983 (board "sought the advice of independent counsel and consultants," including "third-party industry consultant, Lipper, Inc."); *see also Gartenberg*, 528 F. Supp. at 1064.

- Engaged in active negotiation with Fund management, including to reduce the Funds' fees. *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *14, *17-19 (the board "requested additional information or concessions" from fund management); *Gallus*, 497 F. Supp. 2d at 983 (the board "played an active role in the contract negotiation process"); *see also Kalish v. Franklin Advisers, Inc.*, 742 F. Supp. 1222, 1247-48 (S.D.N.Y. 1990), *aff'd*, 928 F.2d 590 (2d Cir. 1991); *Gartenberg*, 528 F. Supp. at 1042-43.

In sum, the board-related facts here—which include the Board's consideration of extensive materials on each *Gartenberg* factor, use of independent industry experts, and arm's-length negotiation with Russell Investments—mirror the facts in *Kasilag* and *Gallus*, where the courts deferred to the board's business judgment. Here too, there is no genuine issue of material fact that would permit the Court to substitute its business judgment for that of the Board. *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *29-45 (no issue of fact regarding board process and "the Board's decision is entitled to 'substantial weight'"); *Gallus*, 497 F. Supp. 2d at 976.

## III. AN ANALYSIS OF THE REMAINING *GARTENBERG* FACTORS DEMONSTRATES THAT RIMCO'S AND RFSC'S FEES MORE THAN SATISFY THE REQUIREMENTS OF SECTION 36(B)

### A. Plaintiff Has Not Met His Burden On *Gartenberg*'s "Nature And Quality Of Services" Factor

#### 1. Plaintiff Misperceives The Inquiry Under Section 36(b)

Plaintiff's main argument regarding the "nature and quality" of RIMCo's services, and indeed the gravamen of his advisory fee claim, is that the amount of fees RIMCo retains <u>after</u> paying its money managers is excessive relative to the services RIMCo provides to the Funds directly. *McClure I* Compl. ¶¶ 2, 29-30. Plaintiff misconstrues the inquiry under Section 36(b).

Nothing in Section 36(b) requires or permits the slicing and dicing of an advisory fee for the purpose of challenging an isolated portion of that fee; nor does anything in Section 36(b) preclude an adviser from engaging third parties to assist it in providing services.  To the contrary, in enacting Section 36(b), Congress stated that courts must "look at . . . all services rendered to the fund or its shareholders and all compensation and payments received."  S. Rep. No. 91-184 (1969), at 13, *reprinted in* 1970 U.S.C.C.A.N. 4897, 4910 (1970) (emphasis added); *Benak v. Alliance Capital Mgmt. L.P.*, No. 01-5734, 2004 U.S. Dist. LEXIS 12231, at *25 (D.N.J. Feb. 9, 2004) ("[U]nder § 36(b) it is the overall nature and quality of the services provided by the investment adviser that is at issue—not merely some small percentage of those services").  By ignoring the totality of services and value that RIMCo provides to Fund shareholders, Plaintiff's approach also improperly elevates form over substance—an approach that was rejected in the seminal *Gartenberg* case.  *Gartenberg*, 528 F. Supp. at 1052 (it is "entirely proper for the fiduciary to consider the totality of values placed at the disposal of the shareholders in appraising the fairness of compensation, or else form would be substituted for substance") (emphasis added), *aff'd*, 694 F.2d 923 (2d Cir. 1982).

The recent decision in *Kasilag* with respect to this issue is instructive.  There, the court found that the plaintiffs' focus on only the services directly provided by the adviser relative to its "retained" fee was improper.  *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *46-49.  The court held that, instead, it would "consider both the services performed by [the subadviser] and the services performed by the Hartford Defendants as adviser," and that those "combined services should be measured against the totality of the advisory fee."  *Id.* at *47-49 (emphasis added).  The court gave particular weight to the fact that, as here, the advisory agreements "explicitly permitted" the adviser to retain subadvisers.  *Id.* at *47; SMF ¶ 8.  As in *Kasilag*, Plaintiff's myopic focus on

only RIMCo's direct services and its retained fee after payment of one expense line item (*i.e.*, the money manager fees) fails as a matter of law.  Instead, the Court must consider the entire package of advisory services provided to the Funds—*i.e.*, including the services the money managers perform on RIMCo's behalf—relative to the Funds' total advisory fees.  And as set forth below, the comparative fee data provided by the Board's independent contractor, Lipper, shows that the Funds' total advisory fees are squarely in line with competitors.  *Infra* § III.C.

Even if Plaintiff could challenge isolated components of RIMCo's advisory fee, nothing about the fee RIMCo retains after paying its money manager expenses is excessive; nor is anything about RFSC's fees excessive.  In approving the Funds' fees, the Independent Trustees specifically took into account the array of essential investment advisory, legal, compliance, administrative and other services that RIMCo and RFSC provide directly to the Funds—all of which are critical to the Funds' operation.  *Supra* Summary of Material Facts § C.3.  The Independent Trustees also took into account the services that the money managers provide with respect to the Funds.  *Id*.  There is no basis to second-guess the Independent Trustees' determination of the value and importance of RIMCo's services vis-à-vis its money managers or the value and importance of RFSC's services.  *Gallus*, 497 F. Supp. 2d at 980 (granting summary judgment where board received virtually identical information as here on services).

**2.      The Funds Have Performed Better Than Or In Line With Their Peers**

The Funds' performance has been better than or in line with industry peers.  The extensive information provided to the Board concerning the Funds' performance (including from independent third parties such as Lipper) shows the Funds have performed consistent with, if not better than, similar funds; indeed, many of the Funds outperformed more than half of their peers in the 10, 5 or 3-year period ending in 2013.  *Supra* Summary of Material Facts § E.  To the

extent any Fund underperformed in a given year, that is hardly remarkable, and as a matter of

law does not establish that fees are excessive. *Migdal v. Rowe Price-Fleming Int'l, Inc.,* 248

F.3d 321, 327 (4th Cir. 2001) ("While performance may be marginally helpful in evaluating the

services which a fund offers . . . [e]ven the most knowledgeable advisers do not always perform

up to expectations, and investments themselves involve quite different magnitudes of risk.");

*Amron v. Morgan Stanley Inv. Advisors Inc.*, 464 F.3d 338, 344 (2d Cir. 2006) ("[A]llegations of

underperformance alone are insufficient . . . .").

    **B.**    **Plaintiff Has Not Met His Burden On *Gartenberg*'s Economies Of Scale Factor**

Plaintiff has not proved that economies of scale even existed, let alone met his burden of

overcoming the business judgment of the Independent Trustees on this *Gartenberg* factor.  The

Board considered extensive information relating to potential economies of scale realized by

RIMCo and RFSC and the extent to which any such economies were shared with the Funds.

SMF ¶ 37.  This is on all fours with *Gallus.  See Gallus*, 497 F. Supp. 2d at 977, 976.

Even putting this aside, Plaintiff has not proved that economies of scale existed with

respect to the Funds.  Courts in Section 36(b) cases have consistently found that for a plaintiff to

meet its burden of proving that the adviser realized economies of scale, the plaintiff must show

that the per-unit cost of servicing the funds decreased as the fund's assets grew.  *In re Am. Mut.*

*Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *77 ("Economies of scale exist when long-

run average production costs (costs per unit) decrease as output quantity increases.") (emphasis

added); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 540 (S.D.N.Y. 2008) (dismissing Section

36(b) complaint that failed to allege "the actual transaction costs at issue and whether the costs

per investor increased or decreased as the assets under management grew") (emphasis added).

Plaintiff has adduced no evidence that the total per-unit cost of performing fund work declined as

the Funds grew in size.[21]  Without such information "there is no way to determine whether any

economy of scale even existed."  *Hoffman*, 591 F. Supp. at 540.

Finally, even if Plaintiff could prove that economies of scale existed, he has not remotely

shown that any such economies were not adequately shared.[22]  As noted, RIMCo and RFSC

share any potential economies with the Funds through, among other things, fee waivers and

breakpoints in the Funds' administrative fees, all of which the Board considered in approving the

Funds' fees.  SMF ¶¶ 37, 44-45; *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS

120597, at *139-40 ("[e]conomies of scale can be shared with fund shareholders in a number of

ways, including breakpoints . . . and waivers"); *Gartenberg,* 528 F. Supp. at 1054 (breakpoints

are an automatic form of sharing).  From 2012 to 2015, the fee waivers alone resulted in over

$41 million in advisory fee savings for Fund investors.  *Supra* note 19.  Given this sizeable level

of savings, Plaintiff cannot meet his burden of proving that any economies of scale were not

---

[21] Instead of examining the total per-unit cost, Plaintiff's expert improperly considers only a subset of costs—RIMCo's operating expenses—while ignoring other significant costs, such as RIMCo's money manager expenses.  *See* Hood Decl. Ex. 102, Kopcke Tr. 186:24-187:7 (admitting he did not include money manager fees and other expense categories in his economies of scale analysis); *Id.* Ex. 104, Pomerantz Tr. 351:16-22 (admitting he did not include transfer agency and distribution costs in his economies of scale analysis).  This is improper because "relying on a subset of costs in an economies of scale analysis may yield incorrect results. Analyzing only a subset of costs does not allow for the possibility that a firm may realize economies of scale in one function, but also realize diseconomies of scale in other functions."  *In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *77.  Committing another fundamental error, Plaintiff has also assumed—but has not met his burden of proving—that any reduction in Defendants' costs was the result of economies of scale.  *Id.* at *139 (expert's "analyses of whether economies of scale were realized are also defective because he improperly assumed that any changes in Defendants' costs were the result of economies of scale, when in fact those cost changes may have been caused by other factors unrelated to scale").

[22] Section 36(b) does not require an investment adviser to pass on all economies of scale benefits to the funds.  Rather, it requires only that any such economies be shared equitably with the fund. S. Rep. No. 91-184 at 4, *reprinted in* 1970 U.S.C.C.A.N. at 4901 ("[T]his bill recognizes that investors should share equitably . . . in the economies.") (emphasis added).

adequately shared with the Funds.  *See Gallus*, 497 F. Supp. 2d at 981-82 (granting summary

judgment where defendants shared $12.7 million).

### C.      Plaintiff Has Not Met His Burden On *Gartenberg*'s Comparative Fees Factor

Nothing about the Funds' fees is in any way out of the ordinary, which is unsurprising

given the Board's rigorous oversight.  As in *Kasilag* and *Gallus*, the Independent Trustees

received detailed information from Lipper comparing the Funds' fees to relevant peer groups.

SMF ¶ 38; *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *15-16 (granting summary judgment with

respect to board process where board considered Lipper comparative fee data); *Gallus*, 497 F.

Supp. 2d at 982-83 (granting summary judgment where board considered same); *see also In re*

*Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at *71-72 ("Lipper . . . is a

recognized industry-leading third-party source for mutual fund industry data," including

comparative fee data).  Nothing in that data remotely suggests that the Funds' fees are so

disproportionately large that they could not have been within the range of arm's-length

bargaining.  To the contrary, the data shows that the Funds' fees are consistent with the fees paid

by peer funds—the Funds' total expense ratios are all in the lowest or second-lowest quintile

(with the exception of one Fund that was only slightly above median) and the Funds' advisory

and administrative fees are lower than a significant percentage of peer funds.  *Supra* Summary of

Material Facts § F.  The fact that the Funds' fees are consistent with those charged to similar

funds (combined with the Funds performing consistently with peers) shows, as a matter of law,

that the Funds' fees are not excessive.  *Jones*, 611 F. App'x at 361 (holding that those two facts

alone "jointly suffice under the Supreme Court's standard" in *Jones*); *Strougo*, 188 F. Supp. 2d at

384 (granting summary judgment where fees were "within the range of fees and expenses for

similar funds").

Unable to dispute that the Funds' fees are consistent with those paid by other mutual funds, Plaintiff likely will try to compare the Funds' fees to the fees paid by Russell Investments' non-mutual fund ("institutional") clients, such as pension funds. *See, e.g.*, Hood Decl. Ex. 91, Pomerantz Report, at 30. Plaintiff's comparison is fatally flawed as a matter of law. In *Jones*, the Supreme Court made clear that "[c]omparisons with fees charged to institutional clients . . . will not 'doom a fund to trial.'" *Jones*, 559 U.S. at 350 n.8 (alterations omitted). Instead, Plaintiff must satisfy a demanding three-part test under *Jones*, which requires "[1] a large disparity in fees that [2] cannot be explained by the different services [3] in addition to other evidence that the fee is outside the arm's-length range." *Id*. Plaintiff cannot meet this burden.

First, there is no "large disparity" between the Funds' fees and the fees charged to Russell Investments' institutional clients. To the contrary, a number of those institutional clients pay the same or <u>higher </u>fees than the Funds. SMF ¶ 66. Moreover, a number of Russell Investments' institutional clients are invested in the Funds themselves, and thus pay the very same fees Plaintiff challenges in this case. *Id*. ¶ 67. Significantly, if the fees Russell Investments' institutional clients are willing to pay reflect an "arm's length" fee, as Plaintiff's expert contends (*e.g.*, Hood Decl. Ex. 92, Pomerantz Rebuttal Report, at 9), then the fact that those same clients are willing to pay the Funds' fees demonstrates that the Funds' fees are also within the arm's length range. *Jones*, 611 F. App'x at 360 ("[T]he goal is to identify the outer bounds of arm's length bargaining.").

Second, any disparity between the Funds' fees and the fees paid by Russell Investments' institutional clients is explained by differences in services. The Supreme Court specifically instructed in *Jones* that courts "must be wary of inapt comparisons" because "there may be significant differences between the services provided . . . which are attributable to the greater

frequency of shareholder redemptions in a mutual fund, the higher turnover of mutual fund

assets, the more burdensome regulatory and legal obligations, and higher marketing costs."

*Jones*, 559 U.S. at 350.  Those same "significant differences" are present here—the Funds have

significantly more shareholder activity, far more burdensome regulatory and legal demands, and

considerably higher marketing costs than Russell Investments' institutional clients.  SMF ¶ 68;

*see also* Hood Decl. Ex. 92, Pomerantz Rebuttal Report at 8 (Plaintiff's expert admitting the

Funds and institutional products are offered in different markets); *Jones*, 559 U.S. at 350 n.8

(courts must consider "the different markets for advisory services" and "must reject" fee

comparisons where "services rendered are sufficiently different that a comparison is not

probative").

Finally, for all the reasons set forth in the other sections herein, Plaintiff also has not

adduced the required "other evidence" that the fee is outside the arm's length range.  *Jones*, 559

U.S. at 350 n.8; *see also Gallus*, 675 F.3d at 1181 (rejecting plaintiffs' argument that allegedly

"flawed fee-negotiation process" can qualify as the "additional evidence" required under *Jones*).

### D.      Plaintiff Has Not Met His Burden On *Gartenberg*'s Profitability Factor

While it is well settled that Plaintiff cannot establish a violation of Section 36(b) by

alleging that Defendants "just plain made too much money,"[23] Defendants' profit margins with

respect to the Funds are entirely in line with industry norms.  Defendants' overall profitability

with respect to the RIC funds (including distribution expenses, but before taxes) ranged from REDACTI

REDACTED     from 2012 to 2013.  *Supra* Summary of Materials Facts § G.  Excluding

distribution-related expenses and taxes, from 2012 to 2013, Russell Investments' profit margins

---

[23] *Kalish*, 742 F. Supp. at 1226-27, 1236  (Section 36(b) "does not forbid an adviser-manager from earning a profit [and] a 'cost-plus' type of contract is not required"); *see also* S. Rep. No. 91-184, at 6, *reprinted in* 1970 U.S.C.C.A.N. at 4902 (similar); *Krinsk*, 875 F.2d at 410 (high profitability alone does not support finding that fee is excessive).

on the Funds' advisory fees ranged from<sup>REDACTED</sup> and its profit on the Funds' administration

fees ranged from<sup>REDACTED</sup> *Id.* These profit margins are below or comparable to the range of

margins that courts have found to be reasonable in previous Section 36(b) cases, many of which

were calculated on a post-tax basis and included certain distribution expenses (lowering

profitability). *See, e.g.*, *Schuyt*, 663 F. Supp. at 978 n.49, 979 (pre-tax margins up to 77.3% and

post-tax margins up to 38.6%, including "sales promotion" costs); *In re Am. Mut. Funds Fee

Litig.*, 2009 U.S. Dist. LEXIS 120597, at *135-37 (excluding distribution expenses, pre-tax

margins ranging from 36% to 52%; including distribution, pre-tax margins ranged from 42% to

48%); *Kalish*, 742 F. Supp. at 1236, 1250 (post-tax margin of up to 37.8% "neither requires nor

supports a finding [of excessiveness]"). As in *Gallus*, the Independent Trustees' evaluation of

*Gartenberg*'s profitability factor should not be second-guessed. *Gallus*, 497 F. Supp. 2d at 981

(granting summary judgment where board received "detailed reports on . . . profitability").

 Plaintiff's expert, Mr. Barrett, offers artificially inflated alternative profit margins,

claiming that RIMCo should have treated money manager fees as contra-revenue instead of an

expense in calculating its profitability. But RIMCo engages the money managers, establishes the

investment parameters that they must follow, manages them on a daily basis, and ultimately is

responsible for their work. SMF ¶¶ 9, 11-12, 47. RIMCo also pays them. *Id.* ¶ 10. Given that,

treating their fees as a RIMCo expense is proper under generally accepted accounting principles

("GAAP"), as Mr. Barrett himself has acknowledged. Hood Decl. Ex. 103, Barrett Tr. 143:21-

145:10; *Id.* Ex. 90, Barrett Rebuttal Report, at 24, *Sivolella v. AXA Equitable Life Ins. Co.*, No.

11-04194 (D.N.J.) (Sept. 19, 2014) ("I agree that for external accounting and financial reporting

under GAAP, subadvised fees are generally reported as expenses"). Indeed, an independent

auditor, PricewaterhouseCoopers LLP, reviewed FRC's financial statements, which treated the

money managers' fees as expenses, and confirmed this was consistent with GAAP.  *See* Hood

Decl. Ex. 109, at RIMCO_0335878, RIMCO_0335880.

In any event, the Independent Trustees were well aware of the amount of the money

managers' fees and could treat those fees however they saw fit.  As in *Gallus*, "[a]lthough

Plaintiffs suggest that the Board should have had different information than what the Board was

provided," Plaintiff's experts "do not point to any authority detailing requirements for the

presentation of profitability data."  *Gallus*, 497 F. Supp. 2d at 981; *see also Kasilag*, 2016 U.S.

Dist. LEXIS 47063, at *34 (rejecting same argument as merely "re-arranging the documents and

information that were provided to the Board").[24]  Plaintiff's criticisms of Defendants' fund

profitability estimates fail to raise any genuine issue for trial.

### E.    Plaintiff Has Not Met His Burden On *Gartenberg*'s "Fall-Out Benefits" Factor

"Fall-out benefits" are profits to the adviser that "would not have occurred 'but for' the

existence of the Fund."  *Krinsk*, 715 F. Supp. at 495.  Plaintiff does not allege any fall-out

benefits in his Complaints, nor do Plaintiff's experts purport to identify any fall-out benefits.

---

[24] Plaintiff's expert tries to bolster his argument by referencing an inapposite SEC consent decree that mentions Smith Barney's treatment of sub-transfer agent fees.  *In re Smith Barney Fund Mgmt. LLC*, SEC Admin. Proceeding, No. 3-11935 (May 31, 2005), *available at* https://www.sec.gov/litigation/admin/34-51761.pdf ("*Smith Barney*").  This non-litigated settlement has no precedential value and does not purport to alter GAAP or supply accounting rules for any entities.  *See CFTC v. Hanover Trading Corp.*, 34 F. Supp. 2d 203, 206 n.19 (S.D.N.Y. 1999) (consent order has limited value because it is "untested in the adversary crucible" and "simply memorializes an agreement of the parties to end litigation upon certain terms").  In any event, the facts here could not be more different.  In *Smith Barney*, the respondents (1) allegedly created a sham subcontracting relationship that was specifically designed to conceal the existence of an illegal rebate paid to the respondents by the funds' former transfer agent, (2) performed essentially no work, and (3) committed massive failures to disclose to the board (including the failure to disclose the existence of a secret side letter with the terms of the hidden rebate).  *Smith Barney*, at 4-15.  No such facts are remotely present here.

Plaintiff has failed to meet his burden with respect to this *Gartenberg* factor.  *See In re Am. Mut. Funds Fee Litig.*, 2009 U.S. Dist. LEXIS 120597, at \*142-43 (plaintiff has burden on this factor).

## IV.    PLAINTIFF LACKS STANDING WITH RESPECT TO THE RUSSELL MULTI-STRATEGY ALTERNATIVE FUND

As previously disclosed to the Fund's shareholders, on July 26, 2016, the Russell Multi-Strategy Alternative Fund will be liquidated and cease to exist.  Hood Decl. Exs. 7, 8.  As a result, as of that date, Plaintiff will no longer be a "security holder" with respect to that Fund and there no longer will be any entity to which any recovery for that Fund could be distributed.  *Id.*; *see also* 15 U.S.C. § 80a-35(b) (authorizing Section 36(b) suits only by SEC or "security holder" in fund); *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 535 n.11 (1984) ("[A]ny recovery obtained in a § 36(b) action will go to the company rather than the plaintiff."); *Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 118 (D. Mass. 2006) (same); *id.* at 117-18 ("Former security holders may not bring a claim on behalf of an investment company that they formerly held shares in, but no longer do.").  Accordingly, while Plaintiff's claims should be dismissed in their entirety, at a minimum, an order dismissing these actions with prejudice with respect to this Fund should be entered for lack of standing.  *Kolancian v. Snowden*, 532 F. Supp. 2d 260, 262-63 (D. Mass. 2008) (derivative plaintiff lost standing under "continuous ownership" rule after company merged); *Billings v. GTFM, LLC*, 867 N.E.2d 714, 720-24 (Mass. 2007) (derivative plaintiff lost standing where "he no longer had any interest" because "company had dissolved").[25]

---

[25] In addition to lacking standing under the "continuous ownership" rule, Plaintiff also lacks Article III standing because, once the Fund is liquidated, there will be no injury that can be "redressed" by Plaintiff's claims.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102-10 (1998) (Article III standing requires "redressability—a likelihood that the requested relief will redress the alleged injury"); *Daily Income Fund*, 464 U.S. at 535 n.11 ("[A]ny recovery obtained in a § 36(b) action will go to the company rather than the plaintiff.").

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment dismissing these actions with prejudice should be granted in its entirety.  Alternatively, Defendants respectfully request that the Court grant summary judgment with respect to any issue for which the Court determines there is no genuine issue of material fact.  *See, e.g.*, *Kasilag*, 2016 U.S. Dist. LEXIS 47063, at *44, *65 (granting summary judgment "insofar as the Court determines that the Board's determination is entitled to substantial weight").

Dated:  June 24, 2016

O'CONNOR CARNATHAN
& MACK LLC

By:  /s/ Sean T. Carnathan
Sean T. Carnathan
One Van de Graaf Drive, Suite 104
Burlington, MA 10803
(781) 359-9000

MILBANK, TWEED, HADLEY
& MᶜCLOY LLP
Sean M. Murphy (*pro hac vice*)
Andrea G. Hood (*pro hac vice*)
28 Liberty Street
New York, NY  10005
(212) 530-5000

MILBANK, TWEED, HADLEY
& MᶜCLOY LLP
Robert J. Liubicic (*pro hac vice*)
601 South Figueroa Street
Los Angeles, CA 90017
(213) 892-4000

*Attorneys for Defendants Russell Investment Management Company and Russell Fund Services Company*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the date hereof this document was filed through the Court's

CM/ECF system and will be sent electronically to the registered participants identified in the

Notice of Electronic Filing (NEF).

/s/ Sean T. Carnathan
Sean T. Carnathan (#636889)